## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MARIANE PEARL,** in her own right and as Representative of the **ESTATE OF DANIEL PEARL,** Deceased and as **Guardian for** their **Minor Son.** | ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **vs.** | ) ) |
| **AHMED OMAR SAEED SHEIKH**    **AKA "CHAUDREY BASHIR"**    **AKA "BASHIR"** | ) ) ) ) |
| **SHEIKH MOHAMMED ADEEL** | ) ) |
| **AFTAB ANSARI** | ) ) |
| **FAISAL BHATTI**    **AKA ZUBAIR CHISHTI** | ) ) ) |
| **NAEEM BUKHARI**    **AKA QARI ATAUR RAHMAN** | ) ) ) |
| **AMJAD FAROOQI (DECEASED)**    **AKA MANSUR HASNAIN**    **AKA IMTIAZ SIDDIQUI**    **AKA HAYDER OR HAIDER** | ) ) ) ) ) |
| **FAZAL KARIM** | ) ) |
| **ALI KHAN** | ) ) |
| **SAUD MEMON,** The **ESTATE OF SAUD MEMON** And **HEIRS OF SAUD MEMON** | ) ) ) ) |
| **KHALED SHEIKH MOHAMMED** | ) ) |
| **FAHAD NASEEM** | ) ) ) |

**CV 07 2908**

**IRIZARRY, J.**

**LEVY, M.J.**

CIVIL ACTION NO. _____

COMPLAINT

JURY TRIAL DEMANDED

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUL 18 2007   ★

BROOKLYN OFFICE

Dockets.Justia.com

MOHAMMED HASHIM QADEER          )
   AKA "ARIF"                   )
   AKA HASHIM KADIR             )
                               )
ABDUL RAHMAN                    )
                               )
ASIF RAMZI (Deceased)           )
                               )
SALMAN SAQIB                    )
   AKA SYED SULEIMAN SAQUIB     )
                               )
AL RASHID TRUST                 )
                               )
AL AKHTAR TRUST INTERNATIONAL   )
   AKA AL AKHTAR TRUST          )
                               )
AL QAEDA                        )
                               )
HABIB BANK LIMITED              )
                               )
HARAKAT UL-MUJAHEDEEN           )
                               )
HARAKAT UL-MUJAHEDEEN AL-ALMI   )
                               )
JAISH-E-MOHAMMED                )
                               )
LASHKAR-E-JHANGVI               )
                               )
       Defendants.              )

## Introduction

1.      Upon information and belief, in the early months of 2002, a coalition of affiliated terrorists abducted, tortured and brutally executed Wall Street Journal reporter Daniel Pearl in Karachi, Pakistan. A U.S. citizen, Daniel Pearl was the Wall Street Journal's South Asia bureau chief. At the time of his abduction and murder, Daniel Pearl was 38 years-old, married and about to become a new father.

2.      This action is brought by Mariane Pearl, Daniel Pearl's wife. Ms. Pearl brings this action in her own right, as Executor of the Estate of Daniel Pearl and as

Guardian on behalf of their minor son. Plaintiff Mariane Pearl is a French citizen residing in Paris, France. The minor son of Plaintiff Mariane Pearl and decedent Daniel Pearl is a joint American and French citizen residing in Paris, France. This Complaint is brought against those individual terrorists who kidnapped, tortured, and murdered Daniel Pearl and those individuals and organizations which aided and abetted in those acts. The Defendants named in this Complaint are members of the affiliated banned Islamic jihadi, sectarian and Pakistani separatist terrorist organizations Harakat ul-Mujahedeen ("HuM"), ,Jaish-e-Mohammed ("JeM"), Lashkar-e-Jhangvi ("LeJ") and al Qaeda. Supporting these terrorists are the banned Islamic charities Al Rashid Trust and its functional successor, Al Akhtar Trust International. Providing financial services to the Al Rashid Trust and the Al Akhtar Trust International is Defendant Habib Bank Limited ("Habib Bank").

3.    Plaintiffs seek to hold responsible those terrorists, terrorist organizations and the supporting charitable and banking organizations for the senseless kidnapping, torture and murder of Daniel Pearl.

4.    The material support provided to the terrorists included the logistical and financial support in the form of:

- training;

- shelter;

- weapons;

- transportation;

- food;

- communications equipment;

- financing; and

- financial services.

5.      Plaintiffs in this lawsuit assert statutory, state and federal common law claims available to victim's surviving spouse, child, and legal representative. Claims in this lawsuit are brought pursuant to the anti-terrorism provisions of 18 U.S.C. § 2333, *et. seq.*, the Torture Victim Protection Act ("TVPA"), Pub. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)); hostage taking as a violation of customary international law, the Alien Tort Statute ("ATS"), 28 U.S.C. §1350, wrongful death, survival, and related federal common law and state law claims. Congress' enactment of the terrorist-related statutes as described herein evidences legislative intent for accountability and provides victims a forum to achieve those goals. In addition to accountability and compensation, this suit seeks to punish and deter future acts of terrorism as Congress authorized and intended, and as international law has long provided.

## JURISDICTION AND VENUE

6.      Jurisdiction arises pursuant to 28 U.S.C. §§1331 and 1332(a)(2), and 18 U.S.C. § 2338. Jurisdiction also arises pursuant to the anti-terrorism provisions of 18 U.S.C. §§2334, 2338, the TVPA and the ATS pursuant to 28 U.S.C. §1350. This Court also has jurisdiction over claims herein pursuant to 28 U.S.C. § 1367. This Court has both personal and subject matter jurisdiction over the Defendants named above.

7.      Venue is both proper and convenient in this District pursuant to 28 U.S.C. §§ 1391(d) and 28 U.S.C. § 2334.

## PARTIES

### I.  PLAINTIFFS

8.  The Plaintiff is Daniel Pearl's wife Mariane Pearl, who is a French citizen residing in Paris, France.  Mariane Pearl brings this action in her own right, as Personal Representative of the Estate of Daniel Pearl, who was a U.S. citizen residing in India, and as Guardian of her and Daniel's Minor son who is a joint U.S. and French citizen.

### II.  DEFENDANTS

#### A.  BACKGROUND

9.  Daniel Pearl was a celebrated journalist with the Wall Street Journal ("WSJ") serving as the South Asia bureau chief.  At the time he was taken hostage, Daniel Pearl was working on a story for the WSJ about Richard Reid, a suspected member of al Qaeda.  In December 2001, Reid attempted to explode a bomb hidden in his shoe aboard a transatlantic American Airlines flight bound for Miami.  The *Boston Globe* reported on January 6, 2002 that Reid was a follower of the influential Pakistani cleric Sheikh Mubarek Gilani.  Sheikh Gilani previously preached at the Brooklyn, New York Al Farooq mosque where the 1993 World Trade Center bombers met.

10.  After reading the *Boston Globe* article, Daniel Pearl began to investigate Sheikh Gilani.  Daniel Pearl, hoping to interview the cleric, went to Pakistan in early January 2002 accompanied by his wife Mariane Pearl, who was three months pregnant.  Just prior to the trip, Daniel Pearl and Mariane Pearl learned they would be having a son.

11.  Defendant Ahmed Omar Saeed Sheikh ("Omar Sheikh"), a citizen of the United Kingdom residing in Pakistan, and others learned of Daniel Pearl's desire to interview Sheikh Gilani.  Posing as disciples of Sheikh Gilani, Omar Sheikh and other co-

conspirators met Daniel Pearl at the Akbar Hotel in Rawalpindi, Pakistan on January 11, 2002. Omar Sheikh claimed during the meeting that he could arrange the interview Daniel Pearl sought with Sheikh Gilani.    Immediately following the meeting, Omar Sheikh and other Defendants began plotting the kidnapping of Daniel Pearl.

12.    Omar Sheikh and other Defendants then lured Daniel Pearl in a series of increasingly promising e-mails and phone calls to Karachi, Pakistan where his abductors waited.    Finally, on or about January 23, 2002    Omar Sheikh and his conspirators kidnapped Daniel Pearl under the false pretense he was meeting with Sheikh Gilani at the Village Restaurant in downtown Karachi.

13.    For the next eight or nine days Daniel Pearl was forcibly detained and tortured by Defendants at an old nursery compound in a northern suburb of Karachi. Defendants, claiming to be part of a previously unknown group called the "The National Movement for the Restoration of Pakistani Sovereignty," made a range of ransom demands to the U.S. government, including the release of prisoners detained in Guantanamo Bay, Cuba. The demands sent by e-mail to U.S. and foreign media outlets attached pictures of Daniel Pearl's hands in chains and with a gun held to his head. These pictures were distributed worldwide as the Defendants intended.

14.    Daniel Pearl attempted to escape from his captors on two separate occasions. During Daniel Pearl's unsuccessful second escape attempt, which occurred on the sixth day of his detainment, his captors beat him and shot him in the leg, after which his captors chained him to a large motor in the compound to prevent further escape attempts. Additionally, Daniel Pearl refused to eat for two days after overhearing his

captors speak of an "injection" and feared his food might be drugged. Daniel Pearl eventually agreed to eat a sandwich after one of his guards tasted it first.

15.    In spite of repeated pleas from his family and the WSJ to release Daniel Pearl, Defendants on or about January 31, 2002, forced Daniel Pearl to make statements about his religious heritage and to avow sympathy for those detained by the U.S. at Guantanamo Bay.    After making his videotaped statements, Defendants blindfolded Daniel Pearl and brutally beheaded him. Defendants videotaped his execution and distributed the video over the Internet.    Daniel Pearl's body was found by Pakistani authorities on the property of Defendant Saud Memon.    His body had been dismembered, cut into ten pieces, and buried in plastic bags in a shallow grave on the compound where he was held captive.

16.    The kidnappers used Daniel Pearl's cell phone to call and threaten Plaintiff Mariane Pearl who was in Pakistan searching for Daniel. Realizing she did not speak Urdu, the kidnappers hung-up. Later, and again using Daniel Pearl's cell phone, the kidnappers called Pakistani police and threatened to kill Plaintiff Mariane Pearl and her friends.

**B.    FACTUAL ALLEGATIONS AGAINST DEFENDANT**

    **1.    Ahmed Omar Saeed Sheikh ("Omar Sheikh")**

17.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

18.    In February 2002, Ahmed Omar Saeed Sheikh ("Omar Sheikh") admitted to Pakistani authorities he conceived and organized the kidnapping of Daniel Pearl.    Omar Sheikh explained to authorities he divided the kidnappers into independent cells that would conduct separate acts of the plan with little knowledge of the other cells'

operations. Omar Sheikh and Defendants – Salman Saqib, Sheikh Mohammed Adeel and Fahad Naseem – undertook the entrapment of Daniel Pearl, while a second group undertook Pearl's kidnapping, detainment, and torture. Omar Sheikh communicated with his co-conspirators using as many as 5 cell phones registered under aliases. In July 2002, a Pakistani court convicted Omar Sheikh for his role in organizing the kidnapping and murder of Daniel Pearl sentencing him to death.

19.    Omar Sheikh told investigators that "Arif", also known as Defendant Mohammed Hashim Qadeer a/k/a Hashim Kadir, told him about an American journalist seeking an interview with Sheikh Gilani. Qadeer is a member of the banned Islamic terrorist organization Harakat ul-Mujahedeen.

20.    With Arif's help, Omar Sheikh and Arif met Daniel Pearl at the Akbar International Hotel in Rawalpindi, Pakistan on January 11, 2002. Omar Sheikh posed as "Chaudrey Bashir," a Sheikh Gilani disciple who, upon Daniel Pearls' request, could arrange a meeting with the cleric. Over the next 10 or 11 days, Daniel Pearl and Omar Sheikh exchanged increasingly friendly e-mails luring Daniel Pearl into Omar Sheikh's trap.

21.    The first of these e-mails was sent on January 14, 2002 in which Daniel Pearl provided "Bashir" a sample of his published articles as "Bashir" requested in their January 11, 2002 meeting.

22.    On January 16, 2002, Omar Sheikh as "Bashir" e-mailed Daniel Pearl stating "I am sure that when he [Gilani] returns we can go and see him."

23.    On January 19, 2002 after three days without contact from "Bashir", Daniel Pearl e-mailed "Bashir" informing him he wished to see Sheikh Gilani before he left Pakistan on Thursday, January 24, 2002.

24.    "Bashir" replied on January 19, 2002, and confirmed that Sheikh Gilani would meet Daniel Pearl.  Bashir offered to submit questions to Sheikh Gilani or arrange for an interview in Karachi.

25.    Daniel Pearl responded on January 19, 2002, agreeing to see Sheikh Gilani in Karachi.

26.    "Bashir" confirmed by e-mail on January 20 that Sheikh Gilani could see Daniel Pearl on either Tuesday or Wednesday (January 22 or 23, 2002).

27.    On January 22, 2002, "Bashir" e-mailed Daniel Pearl to confirm he was scheduled to meet Sheikh Gilani Wednesday evening.  Bashir relayed that a follower of Sheikh Gilani, Imtiaz Siddique, also known as Defendant Amjad Farooqi, would escort Daniel Pearl to the meeting.

28.    Omar Sheikh, who was born in Britain, grew up in London and attended the London School of Economics.  Radicalized while on a pilgrimage to Bosnia in 1993, Omar Sheikh later trained at the Afghanistan terrorist camps of Harakat ul-Mujahedeen. It was at these training camps where Omar Sheikh came to the attention of Al Qaeda and the Pakistani Directorate of Inter-Services Intelligence ("ISI").  Omar Sheikh became an ISI agent following his training.

29.    During the 1980s, the ISI, which is charged with collecting domestic and foreign intelligence for the Pakistani military government and conducting covert operations to further and protect Pakistani interests, forged extremely close ties with

Islamic militants in Afghanistan and Kashmir fighting the Soviet invasion force. The ISI's Kashmiri and Afghanistan units promoted Islamic fundamentalist militancy in Southeast Asia as a method of combating the perceived threat from the Soviet Union. That support historically came in the form of training, supplies, advice and planning assistance to Islamic militants.

30.     Following the Soviet withdrawal from Afghanistan, the ISI refocused the Islamic militant groups to fight a proxy war with India over the disputed Kashmiri territories. ISI did so by encouraging violent splinter groups to form, such as JeM. The ISI secretly used and supported terrorist groups like JeM to conduct operations against Indian targets disavowing any direct Pakistani action against India.

31.     ISI continued to maintain close operational ties with HuM, its predecessor, Harakat ul-Ansar, through the splinter groups it supported and advised through its operatives such as Omar Sheikh.

32.     One of Omar Sheikh's first operations as an ISI and HuM operative was to kidnap four Westerners, including American Bela Nuss, in India. Omar Sheikh threatened to behead his hostages if HuM leader Masood Azhar was not released from an Indian jail. Indian authorities unravelled the kidnapping plot before any victims were hurt, arresting Omar Sheikh and jailing him with HuM leader Masood Azhar. It was reported that the ISI paid for Omar Sheikh's defense. The two Islamic militants developed a close friendship in jail.

33.     Masood Azhar and Omar Sheikh were later freed together in 1999 in exchange for the release of hostages of an India Airlines flight diverted to Kandahar, Afghanistan. The hijacking was undertaken by Defendant Amjad Farooqi. Farooqi later

became leader of a splinter sectarian terrorist group known as Lashkar-e-Jhangvi (LeJ). LeJ developed close ties with the Taliban and al Qaeda. Upon their release, Azhar and Omar Sheikh were welcomed by Osama Bin Laden in Afghanistan.

34.     In 2000, Omar Sheikh returned to Lahore, Pakistan, joined the Islamic militant group Jaish-e-Mohammed (Army of Mohammed) newly formed by Masood Azhar, the former HuM Secretary General. The Pakistani ISI was instrumental in the development of JeM. Omar Sheikh's frequent travel through Pakistan was aided by the ISI.

35.     Omar Sheikh also fought in Afghanistan in September and October of 2001 with Al Qaeda.

36.     Unknown to Pakistani police, Omar Sheikh turned himself into the Punjab home secretary and former ISI official, Brigadier Ijaz Shah, on February 5, 2002. Retired Brigadier Ijaz Shah sheltered Omar Sheikh from Pakistani police for a week before turning him over on February 12, 2002. Brigadier Shah was Omar Sheikh's ISI handler before his arrest by Indian authorities. Shah is known to be a key ISI official who nurtured and supported Islamic militant groups.

37.     Over time, and while acting as an ISI asset, Omar Sheikh has been closely associated with the Islamic militant groups Harakat ul-Mujahedeen, its closely affiliated splinter group Jaish-e-Mohammed and the sectarian militant group Lashkar-e-Jhangvi and al Qaeda.

**2.     Salman Saqib ("Saqib")**

38.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

39.     Following his arrest, Salman Saqib admitted to a role in the kidnapping of Daniel Pearl. Saqib acknowledged he executed the orders of Omar Sheikh and assisted him by sending e-mails announcing the kidnapping of Daniel Pearl to U.S. and foreign news organizations. Saqib and Defendant Fahad Naseem further admitted purchasing a camera to take pictures of Daniel Pearl. Saqib trained with Omar Sheikh at the Afghanistan training camps of HuM and is an acknowledged member of HuM.

### 3.     Sheikh Mohammed Adeel ("Adeel")

40.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

41.     Sheikh Mohammed Adeel, a former Pakistani policemen, also trained at Harkat ul Mujahideen's Afghanistan camps where he met Saqib. Adeel admitted to a role in the kidnapping plot including writing the Urdu version of the demand e-mails and delivering pictures of Daniel Pearl to those e-mailing ransom demands.

42.     Adeel is a member of HuM.

### 4.     Fahad Naseem ("Naseem")

43.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

44.     Fahad Naseem is the cousin of Saqib. A computer student, Naseem admitted to his involvement in the kidnapping plot. Naseem testified he and Saqib met Omar Sheikh on January 21, 2002 at a house in Karachi, two days before the abduction of Daniel Pearl. Omar Sheikh gave Naseem money to purchase a Polaroid camera to take pictures of the victim. Later, Naseem was given a scanner to scan pictures of Daniel Pearl held hostage to attach to the demand e-mails. Witnesses at Naseem's trial testified that e-

mails concerning Daniel Pearl sent through the Internet were sent from Naseem's Internet account.

### 5.     Amjad Farooqi ("Farooqi") and the heirs of Amjad Farooqi

45.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

46.     Amjad Farooqi was Omar Sheikh's counterpart during the kidnapping and torture, directing the second terrorist cell that captured Daniel Pearl and detained him.

47.     Farooqi is believed to have used the alias Imtiaz Siddiqui and posed as the Sheikh Gilani disciple who would escort Daniel Pearl to the interview.

48.     Farooqi directed Naeem Bukhari and others to successfully kidnap and detain Daniel Pearl.

49.     Farooqi has been affiliated with several Islamic terrorist groups that evolved over time including the outlawed militant groups Lashkar-e-Jhangvi, Jaish-e-Mohammed and Harakat-ul-Jihad-i-Islami.    In the mid 1980's Farooqi was a known fundraiser for HuM's predecessor Harakat ul-Ansar.  He fought in Afghanistan during the Soviet invasion and developed close ties to the Taliban and senior al Qaeda leaders. Farooqi also operated militant training camps in Afghanistan.

50.     Farooqi sheltered Khalid Sheikh Mohammed ("KSM"), an al Qaeda senior leader and mastermind of the 9/11 terrorist attacks and the murder of Daniel Pearl, following the U.S invasion of Afghanistan.  Farooqi worked closely with KSM's al Qaeda replacement Tawfia bin Attash, following KSM's arrest by Pakistani authorities.

**6.     Naeem Bukhari ("Bukhari")**

51.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

52.     Naeem Bukarhi oversaw the capture and guarding of Daniel Pearl.  By motorcycle, Bukhari led Daniel Pearl and a co-conspirator driver from the Village Restaurant in downtown Karachi to a compound in the outer suburbs.  Upon arriving, Bukhari held a gun to Daniel Pearl and announced he had been kidnapped.  Bukhari also brought Pearl his meals which were take-out.

53.     Bukhari admitted to being present at the scene of Daniel Pearl's torture and execution.

54.     Bukhari is the local Karachi leader of Lashkar-e-Jhangvi.

**7.     Fazal Karim ("Karim")**

55.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

56.     Fazal Karim admitted to a role in the kidnapping and murder of Daniel Pearl. Karim, an employee of Saud Memon, guarded Daniel Pearl along with Defendant Zubair Chishti and Bukhari at the compound. Karim told Pakistani authorities he and Chishti beat and shot Daniel Pearl in the leg following an attempt to escape.

57.     Karim has also admitted holding Daniel Pearl while his throat was cut.

58.     Karim divulged the location of Daniel Pearl's body and also revealed that the execution of Daniel Pearl was conducted by three Arabic speaking men who brought a video camera.  Karim explained that his boss, Saud Memon, personally drove the three

Arabic speaking men to the compound. Karim produced to authorities the electronic chip to Daniel Pearl's cell phone.

59.    Fazal Karim is a member of Lashkar-e-Jhangvi.

**8.    Faisal Bhatti, aka Zubair Chishti ("Chishti")**

60.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

61.    Zubair Chishti admitted to a role in the kidnapping and murder of Daniel Pearl. Chishti, along with Defendant Karim, guarded Pearl while he was held captive at the nursery compound. Chishti has also admitted torturing, beating and shooting Daniel Pearl in the leg following an attempt to escape.

62.    Chishti is a member of Lashkar-e-Jhangvi.

**9.    Saud Memon, Estate of Saud Memon ("Memon"), Heirs of Saud Memon**

63.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

64.    Saud Memon, who is recently deceased, knowingly conspired, aided and abetted, and financially supported the kidnapping, ransom, torture, and murder of Daniel Pearl.

65.    Saud Memon knowingly permitted Omar Sheikh and Khalid Sheik Mohammed ("KSM") to use his property to detain, torture, murder, dismember, and bury Mr. Pearl. Memon provided as much as $13,000 U.S. Dollars to fund the kidnapping. Saud Memon then sold Daniel Pearl from Omar Sheikh to al Qaeda and KSM for 50,000

U.S. dollars. Saud Memon personally drove KSM and two co-conspirators who videotaped and executed Daniel Pearl to his property to complete the sale.

66.     Memon, a Karachi businessman, was the principle financier of Harakat ul-Mujahedeen. He was also a financier of al Qaeda. Memon was a trustee of the Defendant Islamic charity Al Rashid Trust, which later changed its name to Akhtar Trust International. U.S. authorities identified Memon as the principle director responsible for Al Akhtar finances.

### 10.     Aftab Ansari ("Ansari")

67.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

68.     Aftab Ansari is an Indian criminal with close ties to Pakistani Islamic terrorists, including Omar Sheikh. Omar Sheikh and Ansari became close associates when jailed together in India.

69.     Following their release from prison, Ansari, operating from India, and Omar Sheikh, operating from Pakistan and Afghanistan, worked together to kidnap wealthy Indians for large sums of money. Omar Sheikh, with the assistance of the ISI, provided training and weapons to kidnappers for a percentage of the ransom money. Profits from the kidnappings were used to fund terrorist operations.

70.     In August of 2001, Ansari extracted $830,000 in ransom money for the kidnapping of a wealthy Indian businessman, Partha Roy Burman. Some of the ransom money was moved through the Al Rashid Trust to Omar Sheikh.

71.     Some of the money Ansari provided Omar Sheikh was used to carry out the kidnapping and murder of Daniel Pearl.

72.     On October 1, 2001, Ansari and Omar Sheikh, under the direction of the ISI, bombed the provincial parliament in Indian-controlled Kashmir killing 36. Additionally, Ansari and Omar Sheikh were involved in the December 12, 2001 bombing of the Indian parliament in New Delhi killing nine people and five attackers.

73.     On January 22, 2002, a day before Daniel Pearl was kidnapped, Ansari claimed credit for the bombing of the American Center in Calcutta, India that killed four policemen. Ansari was arrested February 5, 2002 in Dubai attempting to fly to Pakistan. He was extradited to India on February 9, 2002.

74.     Ansari was sentenced to death for his role in the January 22, 2002 bombing of the American Center in Calcutta.

**11.     Mohammed Hashim Qadeer ("Arif")**

75.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

76.     Mohammed Hashim Qadeer, using the name of "Arif", contacted Daniel Pearl to say he knew someone who could arrange an interview with Gilani. Arif arranged for the January 11, 2002 meeting at the Akbar International Hotel in Rawalpindi between Omar Sheikh, posing as "Bashir", and Daniel Pearl.

77.     Arif is a member of the Harakat ul-Mujahedeen.

**12.     Al Rashid Trust ("Al Rashid") and Al Akhtar Trust International ("Al Akhtar")**

78.     Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

79.     Defendant Al Rashid Trust, and its successor Al Akhtar International Trust, or Al Akhar Trust, are known financiers of al Qaeda and the principal financier of

Defendant terrorist organizations Jaish-e-Mohammed and Lashkar-e-Jhangvi. Al-Rashid Trust was designated by the U.S. on September 23, 2001 as a Specially Designated Global Terrorist Group ("SDGT"). Support provided in the past to these terrorist organizations has included financial and logistical aid as well as arranging travel for Islamic extremists. The U.S. Treasury Department stated:

> When President Bush initiated the financial war on terrorism in September 2001, the Al Rashid Trust was among the first organizations named as a financial facilitator of terrorists. This organization had been raising funds for the Taliban since 1999. The Al Rashid Trust is a group that funded al Qaida and the Taliban and is also closely linked to the al Qaida-associated Jaish Mohammed terrorist group. Al Rashid has been directly linked to the January 2002 abduction and subsequent murder of Wall Street Journal reporter Daniel Pearl in Pakistan. Al Rashid and other fronts and groups have used a British internet site called the Global Jihad Fund, which openly associates itself with Usama bin Laden, to publish bank account information and solicit support to facilitate the growth of various jihad movements around the world by supplying them with funds to purchase their weapons.

80.   According to the U.S. Government Al Akhtar was conducting all activities of the former Al Rashid Trust by mid-March 2002. The U.S. Government designated Al Akhtar Trust as a SDGT on October 14, 2003 and stated:

> Al Akhtar Trust is known to have provided support to al Qaida fighters in Afghanistan. Al Akhtar Trust is carrying on the activities of the previously designated Al Rashid Trust (designated September 23, 2001) and is linked to the Taliban and Al Qaida. An associate of Al Akhtar Trust has attempted to raise funds to finance obligatory jihad in Iraq, and it has been reported that a financier of Al Akhtar Trust has been linked to the kidnapping and murder of the Wall Street Journal's South Asia Bureau Chief, Daniel Pearl. The group leader of the terrorist group Jadish-e-Mohammed, Mastoid Zahra, set up two organizations registered in Pakistan as humanitarian aid agencies: Al Akhtar Trust and Elkhart Trust. Jadish-e-Mohammed hoped to give the impression that the two new organizations were separate entities and sought to use them as a way to deliver arms and ammunition to their members under the guise of providing humanitarian aid to refugees and other needy groups. Pakistani newspaper reporting in November 2000 indicated that Al Akhtar Trust was established under the supervision of prominent religious scholars for the purpose of providing financial assistance for mujahideen, financial support to the Taliban and food, clothes, and education to orphans of martyrs. The Chairman and Chief Executive Officer of Al Akhtar Trust is Hakeen Muhammad Akhtar, a Pakistani citizen, who stated that their services for the Taliban and Mullah Omar

were known to the world. Al Akhtar Trust was providing a wide range of support to Al-Qaida and Pakistani-based sectarian and jihadi groups, specifically Lashkar-e-Tayyiba, Lashkar-I-Jhangvi, and Jaish-e-Mohammed. All three of these organizations have been designated by the U.S. These efforts included providing financial and logistical support as well as arranging travel for Islamic extremists. This designation covers operations of Al Akhtar Trust through offices and individuals operating outside of Pakistan.

81.     As noted above, as of 2003, the Chairman and Chief Executive of Al Akhtar Trust was Hakeem Muhammad Akhtar, a Pakistani citizen. Akhtar has publicly acknowledged the Trust's services in Afghanistan and his special relations with Mullah Omar, Supreme Commander of the Taliban.

82.     In early 2003, a senior al Qaeda detainee told U.S. authorities Al Rashid and Al Akhtar were the primary relief agencies operating as cover organizations for al Qaeda. The organizations were used to move supplies into Qandahar, Afghanistan. U.S. authorities have identified Saud Memon as the "individual primarily responsible for the Al Akhtar Trust's finances and the direction of financial resources and support for the Trust."

83.     The U.S. Department of Treasury stated in its website that "Al Rashid has been directly linked to the January 2002 abduction and subsequent murder of Wall Street Journal reporter Daniel Pearl in Pakistan."

84.     Al Rashid Trust and the Al Akhtar Trust aided, abetted and conspired in the murder of Daniel Pearl providing material support in the form of financial assistance, cover, and logistical assistance to Omar Sheikh, Saud Memon, and the other co-conspirators.

### 13.    Khalid Sheikh Mohammed ("KSM")

85.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

86.    In March 2007, Defendant KSM admitted killing Daniel Pearl to a U.S. military tribunal, stating "I decapitated with my blessed right hand the head of the American Jew, Daniel Pearl, in the city of Karachi, Pakistan." According to Defendant Karim, KSM was one of three men who arrived with video equipment and knives at the location where Daniel Pearl was being held. Following his capture in March 2003 by Pakistani authorities, KSM admitted to being the third highest ranking al Qaeda leader and the operational mastermind of the September 11 attacks. KSM's participation in the conspiracy confirms al Qaeda's involvement.

87.    KSM, on behalf of al Qaeda, purchased Daniel Pearl from Saud Memon, Omar Sheikh and the above designated terrorist groups for the purpose of murdering him and broadcasting his murder world-wide over the Internet. KSM was the third highest-ranking member of Al Qaeda and the head of its external relations. Al Qaeda finances were used to purchase Daniel Pearl, carry out his murder and dismemberment, and broadcast his murder worldwide.

88.    In an interview with Al Jazeera, KSM provided a digital recording of the murder to a reporter.

### 14.    Habib Bank Limited

89.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

90.    Habib Bank Limited ("Habib") is a Pakistani-based global financial institution with a U.S. branch office located at 60 East 42nd Street, New York City, New York ("New York Branch"). Habib Bank Limited also has branches in England, Bangladesh, Holland and Belgium.

91.    In December 2006, U.S. and New York banking authorities found Habib's New York Branch operations failed to fully comply with applicable laws, rules, and regulations concerning U.S. anti-money laundering policy and procedures including the Bank Secrecy Act.  Habib's New York Branch provides correspondent banking services to its respondent banks and conducted U.S. dollar fund transfer clearing.  Habib's New York Branch was found to have compliance and risk management deficiencies in these areas of operation. On December 19, 2006 Habib and its New York Branch acknowledged the serious deficiencies found by U.S. and New York banking authorities and agreed to overhaul its money laundering and Bank Secrecy Act compliance programs.

92.    Habib Bank Limited, and its subsidiaries, knowingly and intentionally maintained the accounts of Al Rashid Trust, also known as Al Rasheed Trust, and later Akhtar Trust International.   Habib Bank Limited and its subsidiaries knowingly conducted financial transactions on behalf of these charities, knowing they were supporting terrorist groups.  In doing so, Habib and its subsidiaries aided, abetted and provided material support in the form of financial services for the terrorist support organizations.

93.    In July 2006, the United Nations published information indicating Al Rashid Trust held at least two accounts at Habib Bank Limited's Foreign Exchange Branch with the account numbers 055017-41 and 065001-38.

94.     According to the U.S. Treasury Department "Al Rashid and other fronts and groups have used a British internet site called the Global Jihad Fund, which openly associates itself with Usama bin Laden, to publish bank account information and solicit support to facilitate the growth of various jihad movements around the world by supplying them with funds to purchase their weapons."   According to the website, donors could direct specific currency contributions to Al Rashid's Rupees Account No. 42457-74 and its Dollar Account No. 055017-41, both at Habib Bank Limited.

95.     The bank accounts published on the Global Jihad Fund website also included Habib Bank accounts for Harakat ul-Mujahideen.

96.     Pakistani news organizations reported in late 2000 that Al Akhtar Trust was established under the supervision of prominent religious scholars for the purposes of providing financial assistance for mujahideen and financial support to the Taliban.  At a ceremony in Islamabad celebrating the Trust's opening, a senior leader of HuM stated the Trust was commendable and should be supported.  Al Akhtar Trust openly solicited charitable donations through its web site identifying Habib Bank Ltd. account numbers to which donors could contribute for "obligatory jihad."  Donors were advised that they could contact the Trust via email for further information.

97.     Habib Bank continued to carry out financial transfers for these terrorist groups even though they openly and publicly declared their intent to destroy the United States and murder U.S. citizens with Osama bin Laden in 1998.

98.     Habib Bank knew that Harakat-Ul-Mujahideen had signed on to Al Qaeda's and Osama bin Laden's declaration of war against the United States in 1998. The declaration states:

"We – with God's help – call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it."

99.  Habib Bank knew that HuMand JeM members were acting with the support and direction of the ISI.

100.  Habib Bank also knew that the Al Rashid Trust and its Trustee Saud Memon were acting on behalf of the terror group HuM, JeM and LeJ and as fronts for Osama bin Laden and for Al Qaeda, which had declared its intention to murder U.S. citizens.

101.  Nevertheless, Habib Bank provided material support in the form of financial services to support, aid and abet the goals and aspirations of HuM, JeM, LeJ, Al Qaeda, Al Rashid Trust, Al Akhtar Trust and Saud Memon.

102.  Armed with this financial support, Al Rashid Trust, Al Akhtar Trust, Saud Memon, HuM, JeM, LeJ, Al Qaeda and others carried out the kidnapping, ransom, torture, execution and dismemberment of Daniel Pearl and broadcast those images worldwide.

### 15.  Supporting Terrorist Organizations

103.  Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

104.  The supporting terrorist organizations of Harakat ul-Mujahedeen (HuM), Jaish-e-Mohammed (JeM) and Lashkar-e-Jhangvi (LeJ) knowingly and intentionally participated in and supported a conspiracy to kidnap, ransom, and torture of Daniel Pearl on behalf of their affiliated groups.

105.    These terrorist groups also sold Daniel Pearl to Al Qaeda knowing that Al Qaeda was engaged in murderous acts against U.S. civilians as evidenced by the September 11th attacks.

106.    Harakat ul-Mujahedeen (HuM) is a Pakistan-based Islamic militant group seeking to end Indian control of Kashmir.  Its members include militant Islamist Pakistanis and Kashmiris, as well as Arab veterans of the Afghan war against the Soviet Union.  HuM was included in the original U.S. October 1997 Foreign Terrorist Organization (FTO) designations when its name was Harakat al-Ansar.  It subsequently changed its name to Harakat ul-Mujahedeen in an attempt to avoid the U.S. sanctions that accompanied its designation as an FTO.  Under its new name, the group was redesignated as an FTO in October 1999.

107.    Senior HuM leader Fazul Rahman Khalil signed bin Laden's February 1998 fatwa calling for attacks against Americans "wherever and whenever" possible.

108.    With assistance and coordination from al Qaeda, HuM operated terrorist training camps in eastern Afghanistan.  HuM suffered casualties in the U.S. retaliatory strikes against al Qaeda affiliated camps in Khost in August 1998.  HuM leader Fazul Rahman Khalil subsequently vowed to take revenge upon the U.S.

109.    In 1999, HuM members hijacked an Air India flight and successfully obtained the release of HuM senior leader Masood Azhar in addition to Defendant Omar Sheikh.  Upon his release, Azhar formed a new a militant group from within HuM ranks known as Jaish-e-Mohammed.

110.    Mohammed Hashim Qadeer, also known as "Arif", who introduced Omar Sheikh to Daniel Pearl and helped arrange their first meeting, is a HuM spokesperson.

111.   Defendants Omar Sheikh, Saqib and Adeel trained at HuM camps.

112.   Jaish-e-Mohammed (JeM) is an Islamic militant group based in Pakistan and formed by former HuM leader Masood Azhar. The group's aim is to unite Kashmir with Pakistan. JeM was formed from within the ranks of HuM and is known to have been assisted in its development by the Pakistani ISI. Omar Sheikh is a senior member of JeM.

113.   Through its senior leadership, JeM is closely tied to former Afghan Arabs, the Taliban and al Qaeda. Al Qaeda has funded JeM.

114.   Members of JeM who were involved in the kidnapping, ransom, torture, execution and dismemberment of Daniel Pearl include Omar Sheikh, Saqib and Adeel.

115.   Lashkar-e-Jhangvi (LeJ) is a militant Sunni sectarian group whose aim is to create a Sunni Muslim Pakistan. The group focuses primarily on anti-Shia attacks and was banned by Pakistani President Pervez Musharraf in August 2001. In 1997, the group claimed responsibility for the deaths of four American oil workers in Karachi. Many of its members sought refuge with the Taliban in Afghanistan, with whom they had existing ties, when President Musharraf began cracking down on sectarian violence. LeJ was designated a FTO in January 2003.

116.   Amjad Farooqi, who died in a gun battle with Pakistani police, was a senior leader in LeJ. Farooqi is believed to have sheltered Khalid Sheikh Mohammed and to have worked closely with al Qaeda.

117.   Defendant Naeem Bukhari was a member of LeJ as is Karim and Chishti.

118.   Al Qaeda is an international terrorist organization responsible for the September 11, 2001 terrorist attacks in New York City, Washington D.C. and

Pennsylvania, the 2000 bombing of the USS Cole in the Port of Aden in Yemen, and the August 1998 U.S. Embassy bombings in Tanzania and Kenya.

119.    In February 1998, a coalition of Islamic terrorists groups led by al Qaeda issued a religious ruling, known as a fatwa, declaring war upon the United States. The fatwa directed Muslims "to kill the Americans and plunder their money wherever and whenever they find it." The terrorist coalition identified itself in the fatwa as the "World Islamic Front for Jihad against the Jews and the Crusaders" and was signed by leaders of militant Islamist groups in Egypt, Pakistan, and Bangladesh and included Osama bin Laden.

120.    Fazlur Rahman, also known as Fazul Rahman Khalil, was one of the signers of the World Islamic Front 1998 fatwa. Fazul Rahman was a senior member of HuM.

121.    Al Qaeda is known to have provided logistical and financial support to HuM through the training of HuM mujahideen and through direct financial support.

122.    Additionally, Al Qaeda is known to have operational contacts with HuM splinter group JeM and with the sectarian group LeJ.

123.    Each of these terrorist groups conspired and aided to kidnap, ransom, torture, and murder Daniel Pearl.

C.    **FRAUDULENT CONCEALMENT / EQUITABLE TOLLING**

124.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

125.    Defendants intentionally and purposefully hid and concealed their involvement in the kidnapping, torture, and murder of Daniel Pearl.

126.    Defendants attempted to conceal their complicity in these acts by covering their heads and faces while executing Daniel Pearl and by dismembering and burying his body in ten separate pieces.

127.    Defendants were intentionally uninformed about the plot's operations so that they could not reveal any aspect of the plot except their own involvement.

128.    To further safeguard the plot, Defendants also used a variety of aliases, refusing to use their true identities with each other, leaving them unable to identify other when arrested by authorities.

129.    Omar Sheikh, who knew the principle members of the plot, has refused to reveal the other co-conspirators who conducted the actual kidnapping and detainment and murder of Daniel Pearl despite repeated opportunities to do so, including questioning and interrogation.  Co-conspirators have further attempted to provide cover and hiding places for other operatives.

130.    Additionally, those Defendants arrested or interviewed by authorities conspired to provide false leads and reports to government investigators and law enforcement agencies in an attempt to conceal their identity and complicity in these events.

131.    Khalid Sheikh Mohammed's confession was released publicly in March of 2007.

132.    Many of these Defendants have purposefully avoided travel to the U.S. or have not travelled to the U.S. since the date of these acts.

133.    As a result of these intentional acts, Plaintiffs were unable until recently to learn and verify the individuals and entities responsible for Daniel Pearl's death, and the

manner and complete circumstances of Mr. Pearl's torture and captivity and the identity

of those groups and the bank used to fund this operation, in order to file common law

claims and a lawsuit alleging a violation of the Anti-terrorism Act.

### D.    PURPOSEFULLY DIRECTED ACTIVITIES

134.    Plaintiffs incorporate herein by reference the allegations and facts

contained in all prior paragraphs.

135.    Each Defendant purposefully and intentionally kidnapped, tortured, and

ransomed Daniel Pearl because he was a U.S. citizen and a prominent reporter for an

extremely well-known U.S. Publication – the *Wall Street Journal*.

136.    Defendants conspired to kidnap a U.S. citizen and to broadcast

photographs of Daniel Pearl worldwide for the express purpose of inflicting terror on U.S.

citizens and attempting to influence U.S. government policy.

137.    Defendants specifically chose to e-mail and broadcast images of Daniel

Pearl's torture and execution to the U.S. media including the *Wall Street Journal* and the

*Los Angeles Times*.

138.    Defendants were also aware that the terrorist groups Al Qaeda, HuM,

HuMA and LeT had publicly declared the intent to murder U.S. civilians wherever they

may be found.

139.    Therefore, Defendants individually and collectively knew that they would

be subject to potential criminal and civil liability in the U.S. for their actions.

Nevertheless, they proceeded knowingly and intentionally.

## COUNT ONE

## 18 U.S.C. § 2331 (2331 et. seq.) *et. seq.*

140.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

141.    The Defendants herein engaged in acts of international terrorism; activities that involve violent acts dangerous to human life that are in violation of the criminal law of the United States and were intended to intimidate or coerce a civilian population; to influence policy of a government by intimidation or coercion; or to affect the conduct of a government by [kidnapping and] assassination.

142.    Defendants herein kidnapped and held for ransom an internationally recognized American reporter working for the *Wall Street Journal*. The Defendants demanded the release of individuals detained at Guantanamo Bay and made similar political requests of the U.S. government. Photographs of Daniel Pearl, depicted with a gun to his head and in handcuffs, were transmitted to the *Los Angeles Times* and other U.S. and foreign media outlets. When Defendants' demands were not met, Defendants tortured Daniel Pearl, murdered him by beheading, and distributed a videotape of his murder on the Internet. Each of these acts was performed for the purpose of coercing or intimidating or affecting the conduct of the U.S. government.

143.    This activity transcends international boundaries. This is reflected in terms of the means by which the acts were accomplished, the persons Defendants intended to intimidate or coerce, and / or in terms of the locale in which the perpetrators operate or seek asylum. 18 U.S.C. 2331. Defendants purposefully selected an American journalist in Pakistan and transmitted images of his torture and murder directly to U.S. government

officials, the *Wall Street Journal*, the *Los Angeles Times*, and other U.S. and foreign media outlets worldwide with the intent to coerce, intimidate, and alter the conduct of the U.S. government.  These activities transcended international boundaries.

144.    Nationals of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the costs of suit, including attorneys fees.  18 U.S.C. 2333.

145.    Daniel Pearl was a United States national who was killed by reason of an act of international terrorism.  Plaintiff Mariane Pearl on her own behalf, as representative the estate of her deceased husband and as guardian of their minor son, a United States citizen and heir to Daniel Pearl, suffered and continue to suffer severe injury as a result of the conduct of Defendant's acts of kidnapping, hostage taking, ransom, torture, murder, dismemberment, and broadcasting of Daniel Pearl's torture and murder worldwide with purpose to intimidate and coerce the U.S. population and government.

146.    As set forth above, Defendants, jointly, severally and proximately caused the death and injuries described herein through and by reason of acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a criminal enterprise to promote international terrorism through illegal schemes, and / or the material support and sponsorship of international terrorism.

147.    As set forth above, Defendants kidnapped, held hostage, tortured, and murdered Daniel Pearl and / or knowingly aided and abetted or conspired to provide

material support to the perpetrators of such acts.  Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and / or aiding and abetting assistance to al Qaeda, Harakat Ul-Mujahedeen Al-Almi, Jaish-e-Mohammed, and Lashkar-e-Jhangvi.  This material support and / or aiding and abetting of acts of international terrorism allowed Defendants to carry out the kidnapping, torture, and murder of Daniel Pearl.

148.    As a result of Defendants' acts in furtherance of international terrorism, Plaintiffs suffered damages set forth herein.  Defendant's acts included, but are not limited to, financial sponsorship; financial services; providing equipment such as computers, scanners, and cameras; providing access to property where the victim could be secretly held, tortured, murdered and buried; training; education; travel support and assistance, including providing transportation services; transmitting correspondence and photographs by electronic mail; logistical support; financial services; financing and / or any other material support.

149.    Pursuant to 18 U.S.C. §2335, the four-year statute of limitations for a suit for civil damages under 18 U.S.C. §2333 does not include "[t]he time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff."  18 U.S.C. §2335(b).  Here, the Defendants, with the exception of Habib Bank Ltd., have been absent from the United States during the time period since Daniel Pearl was killed.  Therefore, the four-year statute of limitations should be tolled with regard to these Defendants.

150.    Defendant Habib Bank Ltd., by virtue of its concealment of its participation in the provision of financial services to the Defendant SDGTs, including Al Rashid Trust and Al Akhtar Trust, did not permit Plaintiffs to be aware of its participation in the conspiracy.    Habib Bank Ltd.'s December 19, 2006 acknowledgement of the serious deficiencies found by U.S. and New York banking authorities and its agreement to overhaul its money laundering and Bank Secrecy Act compliance programs further supports Plaintiffs' contention that Defendant Habib Bank Ltd. fraudulently concealed its provision of financial services to those organizations and / or individuals involved in the murder of Daniel Pearl.  Plaintiffs were not placed on notice of Defendant Habib Bank Ltd.'s continued participation in the conspiracy until December 2006.

151.    Pursuant to 18 U.S.C. §2333, the estate, survivors and heirs of the decedent who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

152.    **WHEREFORE**, Plaintiffs, who are nationals of the United States, demand judgment in their favor against all Defendants, jointly, severally, and / or individually, and demand treble damages, in excess of the subject matter jurisdiction limit plus interests, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiff and to prevent Defendants from ever again committing such terrorist acts.

## COUNT TWO

## TORTURE VICTIM PROTECTION ACT

153.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

154. The actions of the Defendants as described herein subjected Daniel Pearl to kidnapping, torture, and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)).

155. In carrying out these acts of extrajudicial killings and injury against the Plaintiffs, the actions of each Defendant were conducted under actual or apparent authority, or under color of law.

156. Omar Sheikh is an agent of the ISI - Pakistan's Intelligence Service. Upon information and belief, Daniel Pearl was kidnapped, tortured, and sold for murder by this ISI agent, who was acting under actual or apparent authority of the ISI. After Omar Sheikh was identified as the kidnapper, he was hidden by the ISI for a period of ten days while the world was searching for him. The ISI's effort to protect and hide Omar Sheikh Saeed was approval of these criminal acts.

157. Aftab Ansari was also an agent of the ISI. Aftab Ansari provided material support in the form of financing to Omar Sheikh to carry out the kidnapping, torture and murder of Daniel Pearl. Aftab Ansari performed these acts while acting under actual or apparent authority of the ISI.

158. The ISI developed, funded and used various terrorist organizations such as HuM, LeJ and JeM as assets for various operations including the kidnapping of westerners to extract ransoms for political, military, and terrorists operations.

159. Various members of HuM, LeJ and JeM including Omar Sheikh and Aftab Ansari were acting under color of law as ISI assets and agents when they kidnapped, ransomed, tortured and murdered Daniel Pearl.

160.   Habib Bank knew that while providing financial services to HuM, LeJ, JeM that these groups had members who were acting as ISI agents and under color of State law.

161.   Because Plaintiffs allege the knowledge and involvement of the Pakistani ISI in this case, Plaintiffs believe it would be futile to exhaust local remedies in Pakistan as required pursuant to the Torture Victim Protection Act.  Furthermore, according to the U.S. State Department's Country Report for Human Rights Practices, Pakistan, 2006, released March 6, 2007:

> The law [in Pakistan] provides for an independent judiciary; however, **in practice the judiciary remained subject to executive branch influence at all levels.** In nonpolitical cases, the high courts and Supreme Court were generally considered credible. **Lower courts remained corrupt, inefficient, and subject to pressure from prominent religious and political figures.** The politicized nature of judicial promotions enhanced the government's control over the court system. Unfilled judgeships and inefficient court procedures resulted in severe backlogs at both trial and appellate levels. According to the AHRC, more than 15,000 cases were pending before the Supreme Court. **Ordinary cases take a minimum of five to six years, while cases on appeal can take as long as 20 to 25 years.**

162.   Based on these observations by the U.S. government, Plaintiffs assert that pursuing exhaustion of local remedies in Pakistan would be futile in this case.

163.   As a direct result and proximate cause of the Defendants' violation of the Torture Victim Protection Act, Plaintiffs suffered damages as fully set forth herein.

164.   **WHEREFORE,** Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction of this court plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts perpetrated upon Daniel Pearl or similar acts.

<u>**COUNT THREE**</u>

**HOSTAGE TAKING IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW**

165.   Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

166.   The crime of hostage taking rests on a clear and definite norm of international law which is universally accepted by the civilized world.

167.   "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."   The *Paquette Habana*, 175 U.S. 677, 700 (1900).

168.   The International Convention against the Taking of Hostages, G.A. Res. 34/146, 245, U.N. Doc. A/RES/34/146 (Dec. 17, 1979) ("Hostage Convention") (in force 3 June 1983) is declaratory of existing customary international law.   The Hostage Convention currently has 160 State Parties.   It was signed by the United States on 21 Dec. 1979 and subsequently ratified on 7 Dec. 1984.   Pakistan is also a State Party having acceded on 8 Sept. 2000.

169.   Article 1 of the Hostage Convention states that "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an intergovernmental organization, a natural or juridical person, or group of persons, to do, or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention."

170.    Furthermore, it states that "[a]ny person who: a) attempts to commit an act of hostage taking, or b) participates as an accomplice of anyone who commits or attempts to commit an act of hostage taking likewise commits an offence for the purposes of this Convention."

171.    The United States implemented the provisions of the Hostage Convention under 18 U.S.C. § 1203. It states "whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment." 18 U.S.C. §1203(a).

172.    Further, "[i]t is not an offense under this section if the conduct required for the offense occurred outside the United States unless – (a) the offender or the person seized or detained is a national of the United States; (b) the offender is found in the United States; or (c) *the governmental organization sought to be compelled is the Government of the United States.*" 18 U.S.C. §1203(b) (emphasis added).

173.    Under 18 U.S.C. § 1203, to seize or detain a hostage does not require the hostage taker to use, or even threaten to use, physical force or violence; rather, nonphysical restraint—for example, fear or deception—can be sufficient to restrain a person against the person's will. U.S. v. Si Lu Tian, 339 F.3d 143 (2d Cir. 2003); U.S. v. Carrion-Caliz, 944 F.2d 220 (5th Cir. 1991).

174.    Further illustrating the authority of the Hostage Convention as customary international law is the fact that its *modus operandi* is supported by the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention"), adopted by the General Assembly of the United Nations.  G.A. Res. 54/109, 1, U.N. Doc. A/RES/54/109 (Dec. 9, 1999).  Having been ratified by over 130 countries, including the United States, the Financing Convention makes it an offense to finance certain terrorist act.  Specifically designated for condemnation are those acts proscribed by the Hostage Convention.

175.    The prohibition against hostage taking reflected in the Hostage Convention and the Financing Convention is not new but rather is reflective of long-standing public condemnation of hostage taking as a method of inflicting terror against innocent civilians.

176.    This principle is also reflected in Common Article 3 of the Geneva Conventions of 1949, which provides in pertinent part:  "In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions: (1) Persons taking no active part in hostilities, including members of armed forces who have laid down their arms and those places *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion, sex, birth, or wealth, or any other similar criteria.   To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons: (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment, and torture; [and] *taking of hostages*".  Geneva Convention Relative to the Protection of

Civilian Persons in Time of War, art. III, August 12, 1949, 6 U.S.T. 3316 (emphasis added).

177.    Concern over hostage taking is also reflected in the long-standing proscription of the customary international crime of piracy.

178.    Proscription of hostage taking is also resonant in several other international and regional conventions:

a.  Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, adopted by the General Assembly of the United Nations on 14 December 1973;

b.  International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on 15 December 1997;

c.  International Convention for the Suppression of Acts of Nuclear Terrorism New York, 13 April 2005;

d.  Convention on Offences and Certain Other Acts Committed on Board Aircraft, signed at Tokyo on 14 September 1963 and deposited with the Secretary-General of the International Civil Aviation Organization);

e.  Convention for the Suppression of Unlawful Seizure of Aircraft, signed at the Hague on 16 December 1970;

f.  Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, signed at Montreal on 23 September 1971;

g.  Protocol on the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression

of Unlawful Acts against the Safety of Civil Aviation, signed at Montreal on 24 February 1988;

h.  Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on 10 March 1988 and deposited with the Secretary-General of the International Maritime Organization;

i.  Arab Convention on the Suppression of Terrorism, signed at a meeting held at the General Secretariat of the League of Arab States in Cairo on 22 April 1998 and deposited with the Secretary-General of the League of Arab States (includes explicit reference to the Hostage Convention as defining acts specifically proscribed by this regional treaty);

j.  Convention of the Organization of the Islamic Conference on Combating International Terrorism, adopted at Ouagadougou on 1 July 1999 and deposited with the Secretary-General of the Organization of the Islamic Conference (includes explicit reference to the Hostage Convention as defining acts specifically proscribed by this regional treaty);

k.  OAS Convention to Prevent and Punish Acts of Terrorism Taking the Form of Crimes against Persons and Related Extortion that are of International Significance, concluded at Washington, D.C. on 2 February 1971 and deposited with the Secretary-General of the Organization of American States;

l.  OAU Convention on the Prevention and Combating of Terrorism, adopted at Algiers on 14 July 1999 and deposited with the General Secretariat of the Organization of African Unity (includes explicit reference to the Hostage Convention as defining acts specifically proscribed by this regional treaty).

179.    United Nations Security Council Resolution 1566 also supports this position.  It states, in pertinent part, that the Security Council "*recalls* that criminal acts, including against civilians, committed with intent to cause death or serious bodily injury, **or taking of hostages**, with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a government or an international organization to do or to abstain from doing any act, which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism, are of a political, philosophical, ideological, racial, ethnic, religious or other similar nature, and *calls upon* all States to prevent such acts and, if not prevented, to ensure that such acts are punished by penalties consistent with their grave nature.  S.C. Res. 1566, ¶ 3, U.N. Doc. S/RES/1566 (Oct. 8, 2004) (some emphasis added).

180.    Plaintiffs bring this action for the kidnapping, detainment, torture, ransom, murder and dismemberment of Daniel Pearl.  Images of Mr. Pearl in handcuffs with a gun to his head were transmitted worldwide in order to torture his family and the American Public and to attempt to force the United States Government to release terrorist detainees in Guantanamo Bay, Cuba.

181.    Defendants, individually and collectively, knowingly injured and terrorized Mrs. Pearl by kidnapping and holding hostage her husband Daniel Pearl. Defendants sent e-mail messages threatening to continue to detain, torture and murder Daniel Pearl if the U.S. government did not comply with their demands.

182.   Defendants also called Mrs. Pearl and threatened her life and the continued detention of Daniel Pearl.  Defendants threatened to murder Mrs. Pearl if she could not convince the U.S. government to comply with their demands.

183.   Defendants also directly requested, through Mrs. Pearl, the Pakistani police, the Wall Street Journal, and the Los Angeles Times the release of certain detainees from Guantanamo Bay, Cuba held by the United States as condition for discontinuing their acts against Daniel Pearl.

184.   **WHEREFORE**, the Plaintiff, demands judgment in favor of her, the estate of Daniel Pearl, and their son against Defendants and demands damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, intentional infliction of emotional distress, and / or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FOUR

## HOSTAGE TAKING AS A VIOLATION OF THE ALIEN TORT STATUTE

185.   Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

186.   The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, states that "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

187.   In light of the substantial authority cited *supra*, hostage taking is defined with specificity sufficiently comparable to international law violations that were familiar when the ATS was enacted.

188.   Mrs. Pearl is a foreign national, or alien, for the purposes of the ATS because she is a French national.

189.   Plaintiffs bring this action for the attempted murder, detainment, torture, ransom, extortion and intentional infliction of emotional distress perpetrated against Mrs. Pearl.  Mrs. Pearl was threatened and led to believe that her physical integrity and liberty of movement were endangered through threatening e-mail and phone calls from the phone belonging to Daniel Pearl at the time of his hostage taking.  Defendants threatened to murder and / or take Mrs. Pearl hostage if she could not convince the U.S. government to comply with their demands to release terrorist detainees in Guantanamo Bay, Cuba.

190.   **WHEREFORE**, the Plaintiff, who is an alien, demands judgment in her favor against Defendants and demands damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, intentional infliction of emotional distress, and / or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FIVE

## WRONGFUL DEATH

191.   Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

192.   Plaintiffs herein bring this consolidated action pursuant to Federal common law, state common law, and Federal and state statutory provisions for the wrongful death proximately caused by the Defendants engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and / or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the decapitation of Daniel Pearl.

193.   The Plaintiffs are entitled to recover damages from Defendants for this illegal and wrongful death. Those responsible for these deaths must be held accountable for the losses incurred.

194.   The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal and violent acts of the Defendants as described herein.

195.   As a direct and proximate result of the wrongful death of the Daniel Pearl, the heirs and family have suffered financially and have been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved one.

196.   As a direct and proximate result of the Defendants' intentional acts of kidnapping, torture, international terrorism, and / or aiding and abetting and providing material support for such acts and / or conspiring to commit such acts as outlined above resulting in the wrongful death of Daniel Pearl, the Plaintiffs suffered and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

197.   As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and torturous acts and conduct of the Defendants, the Plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

198.   **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction of this court, plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate and deter Defendants from ever again committing acts of international terrorism.

## COUNT SIX

## SURVIVAL

199.   Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

200.   As a result of the intentional, malicious, reckless, conspiratorial, criminal, grossly negligent and negligent acts of Defendants as described herein, Daniel Pearl was placed in a severe pain, often prolonged, extreme terror, trauma, apprehension of harmful, offensive unwarranted bodily contact, injury and assault. Daniel Pearl suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, intentionally inflicted

physical pain. Daniel Pearl was mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to and during his personal physical injury and death.

201.    As a result of Defendants' criminal and tortuous conduct, Daniel Pearl suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for Daniel Pearl pursuant to federal common law and / or state law statutory or common law claims of survival.

202.    **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction of this Honorable Court plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs and prevent Defendants from ever again committing such terrorist acts.

## COUNT SEVEN

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

203.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

204.    Defendants intended or knew that their conduct and actions would lead to the killing and injury of Daniel Pearl resulting in severe emotional distress; the Defendants intended and knew that Daniel Pearl's kidnapping, detainment, torture, and execution would kill, maim, and / or permanently injure innocent people, leaving a

devastated family to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder on a horrific and profound scale.

205. The actions of Defendants were unconscionable and done with an intentional, malicious, and willful disregard for the rights and life of Daniel Pearl and the surviving loved ones.

206. Additionally, Defendants used Daniel Pearl's cell phone to call and threaten the life of his wife, Mariane Pearl, who was in Pakistan desperately searching for her husband.

207. As a direct and proximate cause of Defendants' intentional misconduct and reckless disregard for human life, Plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for the minor Plaintiff.

208. Defendants, by engaging in this intentional, unlawful conduct, intentionally inflicted emotional distress upon the Plaintiffs.

209. **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction before this Honorable Court plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate

to compensate Plaintiffs and prevent Defendants from ever again committing acts of international terrorism.

## COUNT EIGHT

### AIDING AND ABETTING

210.   Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

211.   As set forth above, Defendants knowingly and substantially assisted in the sponsorship of the ISI, al Qaeda, Harakat Ul-Mujahedeen Al-Almi, Jaish-e-Mohammed, Lashkar-e-Jhangvi and international terrorism and the kidnapping and execution of Daniel Pearl.

212.   At the time of such aiding and abetting, Defendants knew that their role was part of an overall and ongoing illegal, criminal and / or torturous activity.

213.   As set forth above, the Defendants aided and abetted in concerted efforts, transactions, acts and activities designed to further the kidnapping and murder of Daniel Pearl, create terror, and coerce and cause change in the conduct of the United States.

214.   Defendants' aiding and abetting of international terrorism through material sponsorship was a proximate cause Daniel Pearl's death.

215.   As a direct and proximate result of the Defendants' aiding and abetting activities, Plaintiffs have suffered damages as set forth herein.

216.   **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction before this Honorable Court plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate

to compensate Plaintiffs and prevent Defendants from ever again committing acts of international terrorism.

## COUNT NINE

## PUNITIVE DAMAGES

217.    Plaintiffs incorporate herein by reference the allegations and facts contained in all prior paragraphs.

218.    The actions of the Defendants, acting in concert or otherwise conspiring to carry out, aid and abet these unlawful objectives of terror, were intentional, malicious, unconscionable, and in reckless disregard of the rights and safety of Daniel Pearl and his family.  Defendants, acting individually, jointly, and / or severally intended to carry out actions that would brutalize and kill Daniel Pearl, torture and emotionally destroy the Pearl family, and terrorize, appal, and frighten American citizens.

219.    As a result of their intentional, malicious, outrageous, wilful, reckless conduct, the Defendants are individually, jointly and severally liable to all Plaintiffs for punitive damages.

220.    **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and / or individually, in an amount in excess of the minimum for subject matter jurisdiction before this Honorable Court plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

# JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.


Respectfully Submitted,


Michael E. Elsner, Esq. (NY Bar No. ME-8337, VA
    Bar No. 41424, SC Bar No. 72893)
Ronald L. Motley, Esq. (SC Bar No. 4123)
Jodi Westbrook Flowers, Esq. (SC Bar No. 66300)
Donald Migliori, Esq. (RI Bar No. 4936; MA Bar No.
    567562; and MN Bar No. 0245951)
Elizabeth Smith, Esq. (SC Bar No. 68246)
Justin Kaplan, Esq. (TN Bar No. 922145)
John Eubanks, Esq. (MD Bar[1])
MOTLEY RICE LLC
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

---

[1] The Bar of the State of Maryland does not issue identification numbers to its members.